## AFFIDAVIT

I, Wyatt McCabe, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION

1.      I am a sworn Task Force Officer (hereinafter "TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF"). I am also a Detective with the Charleston Police Department (hereinafter "CPD") and have been so employed since July 2019. I am currently assigned to the ATF Louisville Field Division, Charleston, West Virginia Field Office.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the forensic examination of a black in color Apple iPhone in a Louis Vuitton case (hereinafter "TARGET DEVICE"), which is more fully described in Attachment "A," and the extraction from that property of electronically stored information described in Attachment "B."

3.      The contents of Attachment "A" and Attachment "B" to this Affidavit and application for a search warrant are hereby incorporated by reference.

4.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

5.     Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

## STATUTORY AUTHORITY

6.     This investigation concerns alleged violations of federal law, including but not limited to violations of 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Convicted Felon); 18 U.S.C § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense); 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Possession with Intent to Distribute Methamphetamine); and 21 U.S.C. § 846 (Conspiracy to Distribute and to Possess with the Intent to Distribute Methamphetamine).

## AFFIANT'S TRAINING AND EXPERIENCE

7.     Your Affiant is currently employed as a Detective with CPD and a TFO with the ATF.

8.     Your Affiant graduated from the West Virginia State Police Academy, where I learned basic criminal investigation techniques. I have a Bachelor of Business Administration in Economics and International Affairs from Marshall University in Huntington, West Virginia, and a Master of Divinity from Liberty University in Lynchburg, Virginia.

9.   ·  Your Affiant has received investigative training, conducted, and participated in investigations of violations of federal criminal laws, including those relating to firearms and controlled substances.  These acts commonly involve the criminal use and transfer of firearms as well as illicit drug trafficking.

10.   In my current position as an ATF TFO assigned to the Charleston, West Virginia Field Office, my primary responsibilities include investigating individuals or groups who have committed violations of the federal firearms and narcotics laws.  Within that role, my job duties include, but are not limited to:

      a.   Functioning as a case agent, which entails the supervision of specific investigations;

      b.   Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts;

      c.   Functioning as a surveillance agent, which involves observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms; and

      d.   Drafting, obtaining, and executing search warrants.

## AFFIANT'S KNOWLEDGE OF CELLULAR TELEPHONES AND THEIR USE IN CRIMINAL ACTIVITY

11.    Your Affiant is personally, and professionally, familiar with cellular telephones or mobile telephones.

12.    I know that a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice and text message communications between parties in remote locations.

13.    I am aware that cellular telephones usually include a "call log," which records the telephone number, date, and time of calls made to and from the phone.

14.    In addition to enabling voice communications, I know that cellular telephones now offer a broad range of functions, which include, but are not limited to: storing names and phone numbers in electronic address books or contact lists; sending, receiving, and storing text messages and emails; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the internet; and sending, receiving, and storing GPS coordinates of a phone's location.

15.    Based on my knowledge, training, and experience, I know that cellular phones, such as the Apple iPhone described in Attachment "A," can store electronic information for long periods

of time.    This  information  can  sometimes  be  recovered  with forensics tools.

16.    Based on my training and experience, I know that it is a common practice for drug/firearm traffickers to use and keep cellular telephones to facilitate their drug/firearm trafficking business. Cellular  telephones  allow  traffickers  to  remain  in close and nearly instantaneous communication with their customers and suppliers.

17.    In my experience, it is common for cellular telephones used  by  drug/firearm  distributors  and  drug/firearm  users  to contain  evidence  of  drug/firearm  trafficking.    This  evidence includes call logs, text messages, stored emails, contact lists, photographs, and video images of drugs/guns, drug proceeds, and drug/firearm  trafficking  paraphernalia  and  activity,  and  other information.  It is also common for drug/firearm users to utilize cell phones to obtain drugs or firearms.

18.    I also know from my training and experience that the electronic  memories  of  cell  phones,  including  social  media applications,  have  been  found  to  contain  evidence  of  illegal firearm possession, including communications regarding when and how an illegal firearm was obtained, who obtained the illegal firearm for the possessor, and the motivation for possessing the illegal firearm.

19.    I also know that people who sell or possess firearms illegally frequently take or cause to be taken photographs or other images of themselves in possession of firearms, their associates, their property, and assets with cell phones. They also frequently utilize cell phones to communicate with other individuals to purchase or sell firearms.

20.    In addition, based on my training and experience and conversations with other law enforcement officers, I know that people involved in drug/firearm trafficking communicate with each other on social media applications, such as Facebook, Snapchat, Instagram, WhatsApp, etc. I also know that individuals will oftentimes set up dates and times for "deals" on social media applications such as Facebook Messenger and WhatsApp. Based on my training and experience, I know that people are able to, and generally do, access said social media applications on their mobile devices.

## PROBABLE CAUSE

21.    On April 4, 2023, CPD Special Enforcement Unit (hereinafter "SEU") Detectives received information from a confidential informant (hereinafter "CI") in reference to an individual later identified as Terrence Jay MASON (hereinafter "MASON") who was suspected to be selling methamphetamine in the area of Charleston, West Virginia. The CI has previously provided reliable information about drug trafficking in this district.

22.     MASON was originally known to the CI as "Big D." The CI provided a cell phone number which MASON had used to contact the CI as (313)654-5428. Upon running the phone number in THE TransUnion TLO database, it was found that the phone number that the CI provided for "Big D" was registered to MASON. The CI proceeded to positively identify a photograph of MASON as "Big D."

23.     Also on April 4, 2023, CPD SEU Detectives utilized the CI to purchase one ounce of suspected methamphetamine from MASON in exchange for $350 of pre-recorded United States currency. This controlled drug purchase was set up with MASON via phone number (313)654-5428. The CI ultimately arrived at 1316 Frame Street Charleston, Kanawha County, West Virginia (hereinafter "the residence"), where the CI purchased approximately 33 grams of suspected methamphetamine from MASON and George Jamar WRIGHT (hereinafter "WRIGHT") inside of the residence.  The substance was tested by the Drug Enforcement Administration and yielded a positive result for methamphetamine.

24.     On April 6, 2023, CPD SEU Detectives utilized a CI to purchase one ounce of suspected methamphetamine from MASON in exchange for $350 of pre-recorded currency. This controlled drug purchase was set up with MASON via phone number (313)654-5428. The CI ultimately arrived at the residence where the CI purchased approximately 32 grams of suspected methamphetamine from MASON.

The substance was tested by the Drug Enforcement Administration and yielded a positive result for methamphetamine.

25.     On April 12, 2023, CPD SEU Detectives utilized a CI to purchase from MASON one ounce of suspected methamphetamine in exchange for $350 of pre-recorded currency. This controlled drug purchase was set up with MASON via phone number (313)654-5428. The CI ultimately arrived at the residence where the CI purchased approximately 28.74 grams of suspected methamphetamine from WRIGHT. WRIGHT advised the CI that MASON was not home at the time of the controlled drug purchase and was at the store.   The substance was tested by the Drug Enforcement Administration and yielded a positive result for methamphetamine.

26.     On May 2, 2023, I obtained arrest warrants for both MASON and WRIGHT for Possession with Intent to Deliver through Kanawha County Magistrate Court. I also obtained a search warrant through Kanawha County Magistrate Court for the residence to search for MASON and WRIGHT, given their active felony warrants. Traditionally, when someone has an active felony arrest warrant and they are known to reside at a specific address, I obtain a search warrant for the residence as the need may arise to force entry into the residence.   The search warrant specifically sought entry to search for "[t]he physical bodies of Terrence Jay Mason and George Jamar Wright, who have active warrants."

27.    Also on May 2, 2023, CPD SEU Detectives executed the search warrant at the residence in an attempt to locate and arrest MASON and WRIGHT.

28.    SEU Detectives knocked on the side door of the residence. No one answered the door after several moments. At this point, entry was made into the residence. MASON was found in the bathroom attempting to flush a hygiene bag in the toilet. The bag was unzipped and contained what appeared to be banded United Stated currency and a large bag of a crystal-like substance appearing to be methamphetamine. WRIGHT was found hiding in what appeared to be a child's bedroom in the residence. Also located in the residence was Jammeshia Renea CARTER (hereinafter "CARTER"). CARTER was standing in the living room directly next to a distribution quantity of suspected marijuana, suspected methamphetamine, and suspected fentanyl, which were all in plain view on the couch packaged in individual bags.

29.    In addition to the marijuana, methamphetamine, and fentanyl, other items of contraband were also located in plain view. The items are as follows:

    a.    Two firearms (a Huglu Cooperative Silver Eagle RZ17 shotgun, serial number 21P4619, and an Interarms AKM .762 caliber rifle, serial number PAC1156698) lying next to the wall in the southeast corner of the living

room. These firearms were located directly across from the couch where narcotics were observed;

b.    An additional bag of suspected fentanyl lying on the ground next to where MASON was located in the bathroom;

c.    A bag located in the toilet which contained approximately 114 grams of suspected methamphetamine and a large sum of United States currency (previously referenced in paragraph 28 of this Affidavit);

d.    A digital scale with a white powder residue, located in the living room floor sticking out from underneath the couch where the previously mentioned narcotics were located;

e.    A black handgun (Sig Sauer P320 9mm pistol, serial number 58A180190) located on the floor of the bedroom belonging to MASON or CARTER; and

f.    An additional bag of suspected marijuana located on top of the bed in the bedroom belonging to MASON or CARTER.

30.    Due to narcotics, firearms, and drug paraphernalia observed in plain view, I obtained an additional search warrant for the residence in Kanawha County Magistrate Court. The initial search warrant only authorized the search for the bodies of MASON and WRIGHT. Thus, any additional items were not covered by the

10

scope of the initial search warrant. The additional search warrant was obtained and authorized the search of the residence for narcotics, firearms, and related items. In total, the following items were seized from the residence:

     a.    Approximately 53.58 grams of suspected fentanyl, which was field tested and produced a positive result;

     b.    Approximately 144 grams of suspected methamphetamine, which was field tested and produced a positive result;

     c.    Approximately 729.34 grams of suspected marijuana, which was field tested and produced a positive result;

     d.    Approximately $8,724 of United States currency;

     e.    Five firearms: Huglu Cooperative Silver Eagle RZ17 shotgun (S/N: 21P4619), Interarms AKM47 7.62 caliber rifle (S/N: PAC1156698), Ruger P89 9mm pistol (S/N: 310-67918), SIG Sauer P320 9mm pistol (S/N: 58A180190), and SCCY CPX-2 9mm pistol (S/N: 713630);

     f.    Miscellaneous ammunition; and

     g.    Four (4) Apple iPhones.

31.    At the conclusion of this search warrant, MASON, WRIGHT, and CARTER were arrested and arraigned through Kanawha County Magistrate Court.

32.    Following their arrest on May 2, 2023, MASON and CARTER ultimately posted bond and were released from jail for their respective charges.

33.     Shortly after their release, I spoke with the previously utilized CI, who advised me that MASON offered to sell the CI fentanyl. According to the CI, MASON specifically reasoned that this was because his arrest warrant only mentioned his distribution of methamphetamine and that no one suspected him of distributing fentanyl. Due to this information, I believed that MASON was continuing to sell narcotics.

34.     On July 11, 2023, I signed a criminal complaint through Kanawha County Magistrate Court against MASON for Prohibited Person of a Firearm as well as Possession with Intent to Deliver a Controlled Substance due to the evidence seized from the search warrant executed on the residence on May 2, 2023. MASON was convicted in the 3rd Circuit Court of Michigan, in Detroit, Michigan, for carrying a concealed weapon, which is punishable by a term of imprisonment exceeding one year, on or about February 14, 2011. I obtained a certified copy of this felony conviction from the 3rd Circuit Court of Michigan.

35.     On July 13, 2023, CPD SEU Detectives and ATF Agents observed MASON at the residence. CPD SEU Detectives and ATF Agents proceeded to go to the residence in an attempt to arrest MASON on his active warrant. As officers arrived at the residence, MASON and CARTER were walking out the side door. ATF SA Sean McNees and I approached MASON, who was walking towards his vehicle, and he was placed in custody.

36.     Simultaneously, CPD Sgt. Sharp and ATF Resident Agent in Charge Bullard approached CARTER.  Sgt. Sharp directed her to stay where she was. Given the presence of firearms and narcotics in the residence discovered upon execution of the previous search warrant, it was necessary that CARTER remain outside the residence for officer safety. CARTER defied Sgt. Sharp's order and went inside the side door of the residence. Given the previously noted information and the fear that CARTER could obtain a weapon, Sgt. Sharp approached the residence to tell CARTER to come back outside. Sgt. Sharp immediately noticed multiple pieces of cut aluminum foil squares on the kitchen counter with a scale containing white, powdery residue on it, which is consistent with the distribution of narcotics.  The kitchen is visible from the side door of the residence, and it is directly connected to the bedroom belonging to CARTER and MASON.

37.     Based on Sgt. Sharp's observation, the residence was cleared to apply for a search warrant. CARTER, along with MASON'S young daughter, walked out of the back bedroom, which CARTER is known to share with MASON. I assisted with clearing the residence before applying for the search warrant, and no additional persons were located in the residence. I did, however, observe in plain view a bag containing a white powdery substance consistent with that of fentanyl that was open, lying on the floor behind the television in CARTER and MASON'S bedroom. The television was also

13

coated in fresh white powder, which is indicative of the bag quickly being tossed in attempt to conceal it. This is also consistent with CARTER'S immediate path that she took to the bedroom after being told to stay outside by Sgt. Sharp.

38.     Given this information, I obtained a search warrant through Kanawha County Magistrate Court, authorizing a search of the residence.

39.     The search of the residence yielded the following:

    a.     Approximately 5.42 grams of suspected fentanyl, which was field tested and produced a positive result;

    b.     Approximately 1.34 grams of suspected marijuana; and

    c.     The TARGET DEVICE, which was powered on and located on top of the refrigerator in the kitchen, where MASON would have had access to it.

**CUSTODY OF THE CELLULAR TELEPHONE**

40.     As described in more detail in paragraph 39 of this Affidavit, the TARGET DEVICE was seized from the residence. After the TARGET DEVICE was seized, it was taken to the Charleston ATF Field Office, where it was logged into evidence.

41.     In my training and experience, I know that the TARGET DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the phone first came into the possession of law enforcement.

## NATURE OF THE EXAMINATION

42.    There is probable cause to believe that evidence that was once stored on the TARGET DEVICE may still be stored there, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is because when a person "deletes" a file on a cell phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space for long periods of time before they are overwritten.  "Free space" or "slack space" refers to space on the storage medium that is not currently being used by an active file.    Additionally, a cellular phone's

15

operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory, or "cache."

43.  As further described in Attachment "B," this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence is on the TARGET DEVICE because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this

16

forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.

44.   Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for would permit the examination of the TARGET DEVICE consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

45.   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

46.   Based on my training, education, experience, and discussions with other trained investigators, I know that persons who sell or possess drugs and/or firearms frequently take or cause to be taken photographs or other images of themselves, their associates, their property, and assets with cellular phones. Persons who sell drugs and/or firearms communicate with each other via cellular phones while transporting drugs, firearms, and currency. They also utilize cellular phones to discuss criminal activity before, during, and after a particular criminal act.

47.   Based on my training, education, experience, and discussions with other trained investigators, I also know that most drug/firearm traffickers are like any other individuals in our society, in that they maintain certain records on their cellular telephones. These records will normally be retained for long periods regardless of whether their value to the individual has diminished. This type of evidence is often generated, maintained, and subsequently forgotten about. Hence, records maintained in cellular phones, that one would normally think a prudent person would destroy because of their incriminating nature, are still possessed months or even years after they came into the possession of the drug/firearm trafficker.

48.   Based on my training and experience, and the facts set forth above, I believe there is probable cause that evidence of

criminal violations of federal law, including but not limited to violations of 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Convicted Felon); 18 U.S.C § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense); 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Possession with Intent to Distribute Methamphetamine); and 21 U.S.C. § 846 (Conspiracy to Distribute and to Possess with the Intent to Distribute Methamphetamine), will be found on the TARGET DEVICE.

<strong>CONCLUSION</strong>

49.   WHEREFORE, your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET DEVICE to seek the items described in Attachment "B."

Further your affiant sayeth naught.

_____
Wyatt McCabe
Task Force Officer, ATF

Sworn to by the affiant telephonically in accordance with the procedures of Rule 4.1 of the Federal Rules of Criminal Procedure this the _18th_ day of August, 2023.

_____
DWANE L. TINSLEY
United States Magistrate Judge